**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

LIBERTY ACCESS TECHNOLOGIES LICENSING LLC,

Plaintiff,

v.

ASSA ABLOY AB, ASSA ABLOY MOBILE SERVICES AB, AND ASSA ABLOY GLOBAL SOLUTIONS AB,

Defendants.

Civil Action No. 2:22-cv-00507

**JURY TRIAL DEMANDED**

# COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Liberty Access Technologies Licensing LLC ("Liberty Access" or "Plaintiff") files this Complaint for patent infringement against Defendants ASSA ABLOY AB, ASSAY ABLOY Mobile Services AB, and ASSA ABLOY Global Solutions AB (collectively, "Defendants"), alleging, based on its own knowledge as to itself and its own actions, and based on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This is a patent infringement action to stop Defendants' infringement of the following United States Patents (collectively, the "Asserted Patents") issued by the United States Patent and Trademark Office ("USPTO"), copies of which are attached hereto as **Exhibit A**, **Exhibit B**, and **Exhibit C**, respectively:

| | U.S. Patent No. | Title |
|---|---|---|
| A. | 9,373,205 | Access Control System And Method For Use By An Access Device |
| B. | 10,657,747 | Access Control System And Method For Use By An Access Device |
| C. | 11,373,474 | Access Control System And Method For Use By An Access Device |

2. Liberty Access seeks injunctive relief and monetary damages.

## PARTIES

3. Liberty Access is a limited liability company organized under the laws of the State of Texas, with a place of business at 815 Brazos Street, Suite 500, Austin, Texas 78701 (Travis County).

4. Liberty Access is the exclusive licensee of the Asserted Patents with all rights to recover for all past, present, and future infringement, including past damages.

5. Defendant ASSA ABLOY AB is a private limited company organized under the laws of Sweden with its primary place of business located at Klarabergsviadukten 90 SE-111 64 Stockholm, Sweden.

6. Defendant ASSA ABLOY Mobile Services AB ("ASSA ABLOY Mobile Services") is a private limited company organized under the laws of Sweden with its primary place of business located at Förmansvägen 11, SE-117 43 Stockholm, Sweden.

7. Defendant ASSA ABLOY Global Solutions AB ("ASSA ABLOY Global Solutions") is a private limited company organized under the laws of Sweden with its primary place of business located at Förmansvägen 11, SE-117 43 Stockholm, Sweden.

8. ASSA ABLOY AB is the ultimate parent company of ASSA ABLOY Mobile Services, ASSA ABLOY Global Solutions, and numerous other subsidiaries through which it uses, sells, and provides its products, solutions, and services.

9. ASSA ABLOY AB has, in filings in United States courts, held itself out as the party ultimately responsible for its and its subsidiaries' business activities in the United States. *See, e.g.*, **Exhibit D**.

10. ASSA ABLOY AB also regularly enforces its United States patents in United States courts against companies it considers to be its competitors in the United States market. *See, e.g.*,

**Exhibit E, Exhibit F**.

11. On December 1, 2022, ASSA ABLOY AB, through its outside counsel, directed a letter to Liberty Access demanding a license to Liberty Access's patents. That letter discussed "[ASSA ABLOY AB]'s award-winning mobile access technology."

**JURISDICTION AND VENUE**

12. Liberty Access repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

13. This is an action for infringement of United States patents arising under 35 U.S.C. §§ 271, 281, and 284–85, among others. This Court has subject matter jurisdiction of the action under 28 U.S.C. §§ 1331 and 1338(a).

14. Defendants are subject to this Court's specific and general personal jurisdiction under due process and/or the Texas Long Arm Statute due at least to Defendants' substantial business in this judicial district, including: (i) At least a portion of the infringement alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in Texas and in this District.

15. Specifically, Defendants intend to do and do business in, have committed acts of infringement in, and continue to commit acts of infringement in this District directly, through intermediaries, by contributing to and through their inducement of third parties, and offer their products or services, including those accused of infringement here, to customers and potential customers located in Texas, including in this District.

16. Defendants commit acts of infringement in this District, including, but not limited to, use of the Accused Instrumentalities and inducement of third parties to use the Accused Instrumentalities.

17. Upon information and belief and based upon public information, Defendants have committed and continue to commit acts of infringement within this District, including, but not limited to, out of or on behalf of facilities located at 777 Watters Creek Blvd, Allen, Texas 75013 (Collin County). *See* **Exhibit G**, at 3–4.

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391(c), which provides that "a Defendant not resident in the United States may be sued in any judicial district."

## THE ACCUSED INSTRUMENTALITIES

19. Liberty Access repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

20. Based upon public information, Defendants own, operate, advertise, control, sell, import, and/or offer for sale, and instruct their subsidiaries, affiliates, and end users to use the hardware, software, and functionality that allows users to use their Mobile Access features as a key to a hotel room, through marketed products and services, including, but not limited to, the ASSA ABLOY Global Solutions Mobile Access Software Development Kit (SDK), the ASSA ABLOY Global Solutions Mobile Access App, ASSA ABLOY Mobile Services, SESON technology, VingCard Classic Electronic Locks, VingCard Essence Electronic Locks, Visionline, and Vostio Access Management (collectively "Accused Instrumentalities").[1]

[1] *See, e.g.*, **Exhibit H** (Mobile Access Solutions Brochure); **Exhibit I** (Hospitality Brochure (Americas)); and **Exhibit J** (2023 Buyers Guide (Mobile Key)).

21. The Accused Instrumentalities provide features, functionality, hardware, and software that, e.g., permit a hotel to enter a hotel room reservation for a user into a reservation system.[2]







[2] *See* https://youtu.be/YYvYMml-rj8; *see also* **Ex. H**.

22. The Accused Instrumentalities also generate reservation information based on the user's reservation and transmit that reservation information to an application on a portable device of the user, as seen in the screenshots below. *Id.*







ASSA ABLOY Global Solutions Mobile Access
Augusto Hotel
History of Jane Doe's stay
Guest checked in
10:05 (2020-07-06)
Key issued by front desk
10:05 (2020-07-06)
Key ready for delivery
10:05 (2020-07-06)
Key delivered to mobile device
10:06 (2020-07-06)
Key used at premises
Close
New reservation
Check out
Keys
2020-07-10
Hotel gets confirmation that
Mobile Key has been issued to Guest
0:51 / 1:15


The lock decrypts the mobile key and unlocks the door.
1
Guest confirms mobile booking and hotel server initializes check in.
6
The guest's smartphone receives the encrypted key in a secure key vault within the app. When presented to the lock, the access app transmits the encrypted key to the lock through a secure communication channel.
2
The hotel's property management system (PMS) allocates a room and requests Visionline to issue a key.
Visionline generates a digital key, and transfers it to the cloud-based ASSA ABLOY Mobile Services, for secure Over The Air delivery.
5
3
The cloud-based ASSA ABLOY Mobile services encrypts and securely delivers the mobile key to the assigned phone.
4




23. The application on the portable device transmits a message to an access device of a door lock and the access device activates the door lock. *Id.*





The lock decrypts the mobile key and unlocks the door.
Guest confirms mobile booking and hotel server initializes check in.
The guest's smartphone receives the encrypted key in a secure key vault within the app. When presented to the lock, the access app transmits the encrypted key to the lock through a secure communication channel.
The hotel's property management system (PMS) allocates a room and requests Visionline to issue a key.
Visionline generates a digital key, and transfers it to the cloud-based ASSA ABLOY Mobile Services, for secure Over The Air delivery.
The cloud-based ASSA ABLOY Mobile services encrypts and securely delivers the mobile key to the assigned phone.
1
2
3
4
5
6




5
After ensuring that the Bluetooth is enabled, the guest simply holds the smartphone to the door lock, waits for the solid green light and enters the room.

24. In marketing the Accused Instrumentalities, the Defendants represent that "You can choose between three variants of the solution depending on your needs."[3]



Our Mobile Access options for hotels

You can choose between three variants of the solution depending on your needs.

Customer Integration

This solution is created for hotels with their own app initiatives that want to integrate mobile access into their own apps and back end systems. ASSA ABLOY Global Solutions provides a Mobile Access Software Development kit (SDK) together with dedicated onboarding services to facilitate seamless integration.

Third Party Certified Partner App

This solution suits hotels that want mobile app functionality beyond just access control, but don't yet have their own in-house app initiatives. They can here pick a solution from one of our selected app specialist partners, who through our Certified Partner Program already have integrated our mobile access functionality into their products.

ASSA ABLOY Global Solutions Mobile Access App

This is our own ready-to-use, off-the-shelf solution. The app suits hotels that want to provide basic mobile access solutions to their guests in a simple to use format. There are no integrations or third-party dependencies required.

We publish a general app that is available in the App Store and on Google Play. Through an administration portal, hotels can customize their digital key graphics to reflect company branding or design. This will then show in a "Passbook" inspired style for the hotel to use.

Unlock Your Door in a Second with Your iPhone or Apple Watch

With room key in Apple Wallet, guests can access their rooms, elevators, and common spaces like the gym and the pool using just their iPhone or Apple Watch. It's easy, convenient and private. Room key in Apple Wallet integrates into existing access control systems, is simple to distribute and manage, and takes advantage of the built-in security features of iPhone and Apple Watch.

25. Based upon public information, Defendants, directly and/or through its agents, intermediaries, customers, and/or employees use, advertise, provide, and/or educate third parties about the Accused Instrumentalities.

3 *See* **Ex. H**, at 5; *see also* **Ex. I**, at 13.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,373,205

26. Liberty Access repeats and re-alleges the allegations in Paragraphs above as though fully set forth in their entirety.

27. The USPTO duly issued U.S. Patent No. 9,373,205 (the "'205 patent") on June 21, 2015, after full and fair examination of Application No 14/603,434, which was filed on January 23, 2015. *See* **Ex. A**, at A-1. A Reexamination Certificate was issued on February 25, 2022, after supplemental examination of application No. 96/000,367. *See id.,* at A-18–21.

28. Liberty Access is the exclusive licensee of the '205 patent with all substantial rights, and interest in and to the '205 patent, including the sole and exclusive right to prosecute this action and enforce the '205 patent against infringers, and to collect damages for all relevant times.

29. Liberty Access or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '205 patent.

30. The claims of the '205 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that allow for secure access to control of a door lock based on information contained in a current reservation certificate.

31. The written description of the '205 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art priority date. The '205 patent also identifies and circumscribes all information necessary for a skilled artisan to perform each limitation in the claims in light of that which was known in the art at the priority date.

32. Defendants have infringed one or more claims of the ’205 patent by using, providing, supplying, or distributing the Accused Instrumentalities.

33. Defendants have directly infringed, either literally or under the doctrine of equivalents, at least claim 5 of the ’205 patent.

34. For example, the Accused Instrumentalities provide an access device for use in an access control system, the access device comprising: a processor having control of a door lock; and a communication module connected to the processor, the processor is configured to receive a reservation certificate presented by a portable terminal through the communication module; wherein, when a current reservation certificate that comprises an interval of a reservation is presented by the portable terminal, the processor is configured to compare the interval of the reservation of the current reservation certificate to a current time accessible to the processor, determine the current time is within the interval of the reservation, and activate the door lock to allow the portable terminal to unlock the door lock during the interval of the reservation, as recited in claim 5.

35. The processor of the Accused Instrumentalities also has access to the current time, the reservation certificate comprises data representative of an interval of the reservation, and the processor activates the door lock during the interval, as recited in claim 5.

36. Since at least December 1, 2022, Defendants have also indirectly infringed and continue to indirectly infringe one or more claims of the ’205 patent by inducing others to directly infringe one or more claims of the ’205 patent. Defendants have induced and continue to induce their subsidiaries, parents, partners, affiliates, employees, and end-users, including Defendants’ customers and potential customers, to directly infringe, either literally or under the doctrine of equivalents, one or more claims of the ’205 patent by using the Accused Instrumentalities.

Defendants took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Instrumentalities in a manner that infringes one or more claims of the ’205 patent, including, for example, claim 5 of the ’205 patent. Such steps by Defendants included, among other things, advising or directing personnel, subsidiaries, affiliates, contractors, or end-users to make or use the Accused Instrumentalities in an infringing manner; advertising and promoting the use of the Accused Instrumentalities in an infringing manner; or distributing instructions that guide users to use the Accused Instrumentalities in an infringing manner. Defendants are performing these steps, which constitutes induced infringement with the knowledge of the ’205 patent and with the knowledge that the induced acts constitute infringement. Defendants are aware that the normal and customary use of the Accused Instrumentalities by others would infringe one or more claims of the ’205 patent. Defendants’ inducement is ongoing.

37. Defendants have also indirectly infringed and continue to indirectly infringe by contributing to the infringement of one or more claims of the ’205 patent. Defendants have contributed and continue to contribute to the direct infringement of one or more claims of the ’205 patent by personnel, contractors, subsidiaries, affiliates, customers, and other end users by encouraging them to use the Accused Instrumentalities to perform the steps of the patented process as described in one or more claims of the ’205 patent including, but not limited to, provided access to coding, software, or functionalities that allow customers and end users to incorporate functionality from Defendants’ applications into those customers’ and end users’ proprietary brand applications or websites. The Accused Instrumentalities have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the ’205 patent, including, for example, claim 5 of the ’205 patent.

The special features include, for example, the method recited in claim 5, including all the intermediary steps. The special features constitute a material part of the invention of one or more of the claims of the ’205 patent and are not staple articles of commerce suitable for substantial non-infringing use. Defendants’ contributory infringement is ongoing.

38. Defendant ASSA ABLOY AB’s subsidiaries are alter egos of ASSA ABLOY AB, and ASSA ABLOY AB is therefore responsible and liable for any activities performed by its subsidiaries on ASSA ABLOY AB behalf in offering for sale, testing, selling, and/or importing the Accused Instrumentalities in or into the United States and instructing or training end users to use the Accused Instrumentalities in the United States. ASSA ABLOY AB directs and completely and/or effectively controls the conduct of its subsidiaries. ASSA ABLOY AB controls the internal business operations, workings, and affairs of its subsidiaries and related companies. ASSA ABLOY AB and its subsidiaries do not observe and enforce corporate formalities and share common executive level leadership. The relationship between ASSA ABLOY AB and its subsidiaries, parents, and related entities is a sham at least because ASSA ABLOY AB directs and controls all external and internal activities of its subsidiaries and all key United States-market strategy, implementation, and sales decisions are made solely by ASSA ABLOY AB and its direct employees.

39. ASSA ABLOY AB is also liable for the actions of its subsidiaries as to the use, sale, offer for sale, testing, or import in or into the United States of the Accused Products under agency theory and/or because its subsidiaries function as mere agents of ASSA ABLOY AB as to the Accused Instrumentalities. Any and all activities taken by ASSA ABLOY AB’s subsidiaries relating to the use, sale, offer for sale, or import in or into the United States of the Accused Products

are and/or were instigated and directed by ASSA ABLOY AB, and are therefore attributable to ASSA ABLOY AB.

40. Based upon public information, ASSA ABLOY AB has intentionally induced and continues to induce infringement of one or more patent claims in this district and elsewhere in the United States by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise cause third parties including, but not limited to, its subsidiaries, customers, and end users including to offer for sale, sell, import into the United States, and/or use the Accused Products in an infringing manner. To the extent that ASSA ABLOY AB is not the only direct infringer, it instructs its subsidiaries, customers, and end users on how to infringe the through its support and sales to them. ASSA ABLOY AB has entered into agreements with its subsidiaries stating its intent and desire that those subsidiaries use, sell, offer to sale, train or instruct customers and/or end users to use, and/or import the Accused Instrumentalities in and/or into the United States.

41. On information and belief, Defendants have a policy or practice of not reviewing the patents of others (including instructing its employees to not review the patents of others), and thus has been willfully blind of Plaintiff's patent rights).

42. Defendants' actions were at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendants.

43. Since at least December 1, 2022, Defendants' direct and indirect infringement of one or more claims of the '205 patent was, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Plaintiff's rights under the patent.

44. Plaintiff has been damaged as a result of the infringing conduct by Defendants alleged above. Thus, Defendants are liable to Plaintiff in an amount that compensates it for such

infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

45. Plaintiff has suffered and continues to suffer irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Plaintiff has and will continue to suffer this harm by virtue of Defendants' infringement of one or more claims of one or more claims of the '205 patent. Defendants' actions have interfered with and will continue to interfere with Plaintiff's ability to license technology. The balance of hardships favors Plaintiff's ability to commercialize its own ideas and technology. The public interest in allowing Plaintiff to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 10,657,747

46. Liberty Access repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

47. The USPTO duly issued U.S. Patent No. 10,657,747 (the "'747 patent") on May 19, 2020, after full and fair examination of Application No. 16/034,278, which was filed on July 12, 2018. *See* **Ex. B**, at B-1.

48. Liberty Access is the exclusive licensee of the '747 patent with all substantial rights, and interest in and to the '747 patent, including the sole and exclusive right to prosecute this action and enforce the '747 patent against infringers, and to collect damages for all relevant times.

49. Liberty Access or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '747 patent.

50. The claims of the '747 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include

inventive components that improve upon the function and operation of preexisting systems and methods for secure access to control of a door lock based on information contained in a reservation certificate.

51. The written description of the ’747 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the priority date. The ’747 patent also identifies and circumscribes all information necessary for a skilled artisan to perform each limitation in the claims in light of that which was known in the art at the priority date.

52. Defendants have infringed and continue to infringe one or more claims of the ’747 patent by making, using, providing, supplying, selling, offering for sale, or distributing the Accused Instrumentalities.

53. Defendants have directly infringed and continue to directly infringe, either literally or under the doctrine of equivalents, at least claim 1 of the ’747 patent.

54. For example, the Accused Instrumentalities provide an access control system comprising an access device comprising a communication module connected to a processor having control of a door lock; a secure reservation interface to receive a reservation request from a first device for a reservation at a given destination, the reservation interface comprising one or more screens for receiving a selection of a location at the destination and an interval of the reservation; a reservation server, in communication with the reservation interface and a network, to receive the reservation request for the destination that includes a selected location at the destination and an interval of the reservation; issue a reservation certificate describing the interval of the reservation

based on the reservation request and the selected location; and 3) transmit, *via* the network, from the reservation server to a second device distinct from the first device, the reservation certificate and a communication setting corresponding to the access device, d) an application installed on the second device to receive the reservation certificate and the communication setting corresponding to the access device, wherein the application wirelessly transmits the reservation certificate to the access device using the communication setting upon receipt of a command to activate the door lock; and e) wherein the access device receives the reservation certificate from the application based on use by the application of the communication setting, and the processor activates the door lock based on at least the receipt of the reservation certificate..

55. Since at least December 1, 2022, Defendants have also indirectly infringed and continue to indirectly infringe one or more claims of the ’747 patent by inducing others to directly infringe one or more claims of the ’747 patent. Defendants have induced and continue to induce its subsidiaries, parents, partners, affiliates, employees, and end-users, including Defendants’ customers and potential customers, to directly infringe, either literally or under the doctrine of equivalents, one or more claims of the ’747 patent by using the Accused Instrumentalities. Defendants took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use the Accused Instrumentalities in a manner that infringes one or more claims of the ’747 patent, including, for example, claim 1 of the ’747 patent. Such steps by Defendants included, among other things, advising or directing personnel, contractors, or end-users to make or use the Accused Instrumentalities in an infringing manner; advertising and promoting the use of the Accused Instrumentalities in an infringing manner; or distributing instructions that guide users to use the Accused Instrumentalities in an infringing manner. Defendants are performing these steps, which constitutes induced infringement with the

knowledge of the ’747 patent and with the knowledge that the induced acts constitute infringement. Defendants are aware that the normal and customary use of the Accused Instrumentalities by others would infringe one or more claims of the ’747 patent. Defendants’ inducement is ongoing.

56. Defendants have also indirectly infringed and continue to indirectly infringe by contributing to the infringement of one or more claims of the ’747 patent. Defendants have contributed and continue to contribute to the direct infringement of one or more claims of the ’747 patent by personnel, contractors, subsidiaries, affiliates, customers, and other end users by encouraging them to use the Accused Instrumentalities to perform the steps of the patented process as described in one or more claims of the ’747 patent including, but not limited to, provided access to coding, software, or functionalities that allow customers and end users to incorporate functionality from Defendants’ applications into those customers’ and end users’ proprietary brand applications or websites. The Accused Instrumentalities have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the ’747 patent, including, for example, claim 1 of the ’747 patent. The special features include, for example, the method recited in claim 1, including all the intermediary steps. The special features constitute a material part of the invention of one or more of the claims of the ’747 patent and are not staple articles of commerce suitable for substantial non-infringing use. Defendants’ contributory infringement is ongoing.

57. Defendant ASSA ABLOY AB’s subsidiaries are alter egos of ASSA ABLOY AB, and ASSA ABLOY AB is therefore responsible and liable for any activities performed by its subsidiaries on ASSA ABLOY AB behalf in offering for sale, testing, selling, and/or importing the Accused Instrumentalities in or into the United States and instructing or training end users to use the Accused Instrumentalities in the United States. ASSA ABLOY AB directs and completely

and/or effectively controls the conduct of its subsidiaries. ASSA ABLOY AB controls the internal business operations, workings, and affairs of its subsidiaries and related companies. ASSA ABLOY AB and its subsidiaries do not observe and enforce corporate formalities and share common executive level leadership. The relationship between ASSA ABLOY AB and its subsidiaries, parents, and related entities is a sham at least because ASSA ABLOY AB directs and controls all external and internal activities of its subsidiaries and all key United States-market strategy, implementation, and sales decisions are made solely by ASSA ABLOY AB and its direct employees.

58. ASSA ABLOY AB is also liable for the actions of its subsidiaries as to the use, sale, offer for sale, testing, or import in or into the United States of the Accused Products under agency theory and/or because its subsidiaries function as mere agents of ASSA ABLOY AB as to the Accused Instrumentalities. Any and all activities taken by ASSA ABLOY AB's subsidiaries relating to the use, sale, offer for sale, or import in or into the United States of the Accused Products are and/or were instigated and directed by ASSA ABLOY AB, and are therefore attributable to ASSA ABLOY AB.

59. Based upon public information, ASSA ABLOY AB has intentionally induced and continues to induce infringement of one or more patent claims in this district and elsewhere in the United States by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise cause third parties including, but not limited to, its subsidiaries, customers, and end users including to offer for sale, sell, import into the United States, and/or use the Accused Products in an infringing manner. To the extent that ASSA ABLOY AB is not the only direct infringer, it instructs its subsidiaries, customers, and end users on how to infringe the through its support and sales to them. ASSA ABLOY AB has entered into agreements with its

subsidiaries stating its intent and desire that those subsidiaries use, sell, offer to sale, train or instruct customers and/or end users to use, and/or import the Accused Instrumentalities in and/or into the United States.

60. Defendants have had knowledge of the ’747 patent at least as of December 1, 2022.

61. Furthermore, on information and belief, Defendants have a policy or practice of not reviewing the patents of others (including instructing its employees to not review the patents of others), and thus has been willfully blind of Plaintiff’s patent rights.

62. Defendants’ actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendants.

63. Since at least December 1, 2022, Defendants’ direct and indirect infringement of one or more claims of the ’747 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Plaintiff’s rights under the patent.

64. Plaintiff has been damaged and continues to be damaged as a result of the infringing conduct by Defendants alleged above. Thus, Defendants are liable to Plaintiff in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

65. Plaintiff has suffered and continues to suffer irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Plaintiff has and will continue to suffer this harm by virtue of Defendants’ infringement of one or more claims of one or more claims of the ’747 patent. Defendants’ actions have interfered with and will continue to interfere with Plaintiff’s ability to license technology. The balance of hardships favors Plaintiff’s ability to commercialize its own ideas and technology. The public interest in allowing Plaintiff to

enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

**COUNT III: INFRINGEMENT OF U.S. PATENT NO. 11,373,474**

66. Liberty Access repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

67. The USPTO duly issued U.S. Patent No. 11,373,474 (the "'474 patent") on June 28, 2022, after full and fair examination of Application No. 17/646,837, which was filed on January 3, 2022. *See* **Ex. C**, at C-1.

68. Liberty Access is the exclusive licensee of the '474 patent with all substantial rights, and interest in and to the '474 patent, including the sole and exclusive right to prosecute this action and enforce the '474 patent against infringers, and to collect damages for all relevant times.

69. Liberty Access or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '474 patent.

70. The claims of the '474 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting systems and methods secure access to control of a door lock based on information contained in a reservation certificate.

71. The written description of the '474 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the priority date. The ''474 patent also identifies and circumscribes all information necessary for a skilled

artisan to perform each limitation in the claims in light of that which was known in the art at the priority date.

72. Defendants have infringed and continue to infringe one or more claims of the ’474 patent by making, using, providing, supplying, selling, offering for sale, or distributing the Accused Instrumentalities.

73. Defendants have directly infringed and continue to directly infringe, either literally or under the doctrine of equivalents at least claim 1 of the ’474 patent.

74. For example, the Accused Instrumentalities provide an access control system comprising an access device comprising a communication module connected to a processor having control of a door lock, an application on a portable terminal and a server to provide a communication setting to the application, the communication setting corresponding to the access device, and to further provide to the application a reservation certificate comprising an interval of a reservation, wherein the application compares the interval of the reservation to a current time accessible to the application to determine if the reservation certificate is current and activates the door lock by communicating with the access device *via* the communication setting when the application determines that the reservation certificate is current.

75. Since at least December 1, 2022, Defendants have also indirectly infringed and continue to indirectly infringe one or more claims of the ’474 patent by inducing others to directly infringe one or more claims of the ’474 patent. Defendants have induced and continue to induce its subsidiaries, parents, partners, employees, affiliates, and end-users, including Defendants’ customers and potential customers, to directly infringe, either literally or under the doctrine of equivalents, one or more claims of the ’474 patent by using the Accused Instrumentalities. Defendants took active steps, directly or through contractual relationships with others, with the

specific intent to cause them to use the Accused Instrumentalities in a manner that infringes one or more claims of the '474 patent, including, for example, claim 1 of the '474 patent. Such steps by Defendants included, among other things, advising or directing personnel, contractors, or end-users to make or use the Accused Instrumentalities in an infringing manner; advertising and promoting the use of the Accused Instrumentalities in an infringing manner; or distributing instructions that guide users to use the Accused Instrumentalities in an infringing manner. Defendants are performing these steps, which constitutes induced infringement with the knowledge of the '474 patent and with the knowledge that the induced acts constitute infringement. Defendants are aware that the normal and customary use of the Accused Instrumentalities by others would infringe one or more claims of the '474 patent. Defendants' inducement is ongoing.

76. Defendants have also indirectly infringed and continue to indirectly infringe by contributing to the infringement of one or more claims of the '474 patent. Defendants have contributed and continue to contribute to the direct infringement of one or more claims of the '474 patent by personnel, contractors, subsidiaries, affiliates, customers, and other end users by encouraging them to use the Accused Instrumentalities to perform the steps of the patented process as described in one or more claims of the '474 patent including, but not limited to, provided access to coding, software, or functionalities that allow customers and end users to incorporate functionality from Defendants' applications into those customers' and end users' proprietary brand applications or websites. The Accused Instrumentalities have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '474 patent, including, for example, claim 1 of the '474 patent. The special features include, for example, the method recited in claim 1, including all the intermediary steps. The special features constitute a material part of the invention of one or more

of the claims of the ’474 patent and are not staple articles of commerce suitable for substantial non-infringing use. Defendants’ contributory infringement is ongoing.

77. Defendant ASSA ABLOY AB’s subsidiaries are alter egos of ASSA ABLOY AB, and ASSA ABLOY AB is therefore responsible and liable for any activities performed by its subsidiaries on ASSA ABLOY AB behalf in offering for sale, testing, selling, and/or importing the Accused Instrumentalities in or into the United States and instructing or training end users to use the Accused Instrumentalities in the United States. ASSA ABLOY AB directs and completely and/or effectively controls the conduct of its subsidiaries. ASSA ABLOY AB controls the internal business operations, workings, and affairs of its subsidiaries and related companies. ASSA ABLOY AB and its subsidiaries do not observe and enforce corporate formalities and share common executive level leadership. The relationship between ASSA ABLOY AB and its subsidiaries, parents, and related entities is a sham at least because ASSA ABLOY AB directs and controls all external and internal activities of its subsidiaries and all key United States-market strategy, implementation, and sales decisions are made solely by ASSA ABLOY AB and its direct employees.

78. ASSA ABLOY AB is also liable for the actions of its subsidiaries as to the use, sale, offer for sale, testing, or import in or into the United States of the Accused Products under agency theory and/or because its subsidiaries function as mere agents of ASSA ABLOY AB as to the Accused Instrumentalities. Any and all activities taken by ASSA ABLOY AB’s subsidiaries relating to the use, sale, offer for sale, or import in or into the United States of the Accused Products are and/or were instigated and directed by ASSA ABLOY AB, and are therefore attributable to ASSA ABLOY AB.

79. Based upon public information, ASSA ABLOY AB has intentionally induced and continues to induce infringement of one or more patent claims in this district and elsewhere in the United States by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise cause third parties including, but not limited to, its subsidiaries, customers, and end users including to offer for sale, sell, import into the United States, and/or use the Accused Products in an infringing manner. To the extent that ASSA ABLOY AB is not the only direct infringer, it instructs its subsidiaries, customers, and end users on how to infringe the through its support and sales to them. ASSA ABLOY AB has entered into agreements with its subsidiaries stating its intent and desire that those subsidiaries use, sell, offer to sale, train or instruct customers and/or end users to use, and/or import the Accused Instrumentalities in and/or into the United States.

80. Defendants have had knowledge of the ’474 patent at least as of December 1, 2022.

81. Furthermore, on information and belief, Defendants have a policy or practice of not reviewing the patents of others (including instructing its employees to not review the patents of others), and thus has been willfully blind of Plaintiff’s patent rights.

82. Defendants’ actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendants.

83. Since at least December 1, 2022, Defendants’ direct and indirect infringement of one or more claims of the ’474 patent is, has been, and continues to be willful, intentional, deliberate, or in conscious disregard of Plaintiff’s rights under the patent.

84. Plaintiff has been damaged and continues to be damaged as a result of the infringing conduct by Defendants alleged above. Thus, Defendants are liable to Plaintiff in an amount that

compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

85. Plaintiff has suffered and continues to suffer irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Plaintiff has and will continue to suffer this harm by virtue of Defendants' infringement of one or more claims of the '474 patent. Defendants' actions have interfered with and will continue to interfere with Plaintiff's ability to license technology. The balance of hardships favors Plaintiff's ability to commercialize its own ideas and technology. The public interest in allowing Plaintiff to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## JURY DEMAND

86. Plaintiff hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

87. WHEREFORE, Liberty Access requests that the Court find in its favor and against Defendants, and that the Court grant Liberty Access the following relief:

a. Judgment that one or more claims of the Asserted Patents has been infringed, either literally or under the doctrine of equivalents, by Defendants or all others acting in concert therewith;

b. A permanent injunction enjoining Defendants and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in concert therewith from infringement of the claims of the Asserted Patents, and; or, in the alternative, an award of a reasonable ongoing royalty for future infringement of the Asserted Patents, and by such entities;

c. Judgment that Defendants account for and pay to Liberty Access all damages to and costs incurred by Liberty Access because of Defendants' infringing activities and other conduct complained of herein;

d. Judgment that Defendants' infringement of the Asserted Patents be found willful, and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

e. Pre-judgment and post-judgment interest on the damages caused by Defendants' infringing activities and other conduct complained of herein;

f. That this Court declare this an exceptional case and award Liberty Access its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

g. All other and further relief as the Court may deem just and proper under the circumstances.

Dated: December 30, 2022

Respectfully submitted,

By: */s/ Jonathan L. Hardt*

C. Matthew Rozier (CO 46854) *
**ROZIER HARDT MCDONOUGH PLLC**
2590 Walnut Street, Suite 10
Denver, Colorado 80205
Telephone: (720) 820-3006
Email: matt@rhmtrial.com

Jonathan L. Hardt (TX 24039906) *
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite C
Austin, Texas 78701
Telephone: (210) 289-7541
Email: hardt@rhmtrial.com

James F. McDonough, III (GA 117088) *
Jonathan R. Miller (GA507179) *
Travis E. Lynch (GA 162373) *
**ROZIER HARDT MCDONOUGH PLLC**
3621 Vinings Slope, Suite 4300
Atlanta, Georgia 30339
Telephone (470) 480-9505, -9517, -9514
Email: jim@rhmtrial.com
Email: miller@rhmtrial.com
Email: lynch@rhmtrial.com

**Attorneys for Plaintiff *LIBERTY ACCESS TECHNOLOGIES LICENSING LLC***

*Admitted to the Eastern District of Texas

**List Of Exhibits**

A. U.S. Patent No. 9,373,205

B. U.S. Patent No. 10,657,747

C. U.S. Patent No. 11,373,474

D. Complaint, *ASSA Abloy AB v. CPC Patent Techs. Pty. Ltd.*, 3:22-cv-00694 (D. Conn. May 23, 2022)

E. Complaint, *HID Global Corp. v. Wavelynx Techs. Corp.*, 1:22-cv-00362-UNA (D. Del. March 21, 2022)

F. Complaint, *ASSA Abloy AB v. Spectrum Brands, Inc.*, 8:15-cv-00775 (C.D. Cal. May 18, 2015)

G. Hospitality Net website | ASSA ABLOY Article: “Delta Hotels by Marriott Dallas Allen Benefits from Seamless Implementation of Signature RFID Door Locks and Superior Customer Service by ASSA ABLOY Global Solutions”

H. ASSA ABLOY website | Mobile Access Solutions Brochure

I. ASSA ABLOY website | Hospitality Brochure (Americas)

J. ASSA ABLOY website | 2023 Buyers Guide (Mobile Key)